# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MALCOM D. COBB, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00790-TWP-MJD |
| | ) | |
| LEEANN IVERS,  LISA BERGESON, ROGER | ) | |
| PERRY, M.D., GENIFER BRADLY, RN, | ) | |
| SAMANTHA MCABEE, RN, BECKY DAVIS, | ) | |
| Nurse, MELISSA BAGIENSKI, Nurse, SHAWN | ) | |
| SHELBY, Nurse, and WEXFORD HEALTH, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment (Filing No. 99), filed by Defendants Leeann Ivers, Lisa Bergeson, Roger Perry ("Dr. Perry"), Genifer Bradly, Samantha McAbee, Becky Davis ("Nurse Davis"), Melissa Bagienski ("Nurse Bagienski"), Shawn Shelby ("Nurse Shelby") and Wexford Health, (collectively, "Defendants"). Plaintiff Malcolm D. Cobb, Jr., ("Mr. Cobb"), a prisoner at Miami Correctional Facility ("MCF"), initiated this civil rights action alleging that the medical staff at Pendleton Correctional Facility ("PCF") were deliberately indifferent to Mr. Cobb's serious medical conditions from April 2017 until he transferred to MCF in early 2018.  For the reasons stated below, the Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

## I.  LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule  of

Civil Procedure 56(a).  "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor.  *See Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018).

When a party moving for summary judgment asserts facts and supports them with admissible evidence, the court treats those facts as admitted without controversy unless the non-movant specifically controverts them with admissible evidence, shows the movant's assertions are not supported by admissible evidence, or demonstrates that the factual record leaves a material factual dispute.  S.D. Ind. L.R. 56-1(f)(1).  Conversely, when the non-movant asserts facts and supports them with admissible evidence, the court treats those facts as admitted without controversy.  S.D. Ind. L.R. 56-1(f)(2).

## II.  PROCEDURAL BACKGROUND

The Court screened Mr. Cobb's Complaint on August 22, 2018.  (Filing No. 9.)  Its allegations supported Eighth Amendment claims against Wexford of Indiana, LLC ("Wexford"), and eleven individuals Wexford employed to provide medical care to PCF inmates.  Mr. Cobb also pled plausible claims that three individual defendants retaliated against Mr. Cobb for conduct protected by the First Amendment.

In October 2019, the parties stipulated to the dismissal of three individual defendants. (Filing No. 88)  Additionally, the parties agree that a settlement agreement from a previous action

bars all Eighth Amendment claims against individual defendants that were based on actions before August 15, 2017.  (*See* Filing No. 100 at 25; Filing No. 113 at 8–9.)  As such, Mr. Cobb opposes summary judgment only as to the Eighth Amendment claim against Wexford; the Eight Amendment claims against Nurses Samantha McAbee, Melissa Bagienski, and Shawna Shelby; and the First Amendment retaliation claim against Nurse Becky Davis.  (*See* Filing No. 113 at 9–12.)

### III.   FACTS

While at PCF in 2014, Mr. Cobb slipped and broke his right ankle.  (Filing No. 101-9 at 11:24–12:2.)  The fracture was not treated promptly.  *Id.* at 12:3–19.  In May 2015, the fracture worsened, and the bone "busted out the side" of Mr. Cobb's foot.  *Id.* at 12:20–22.  Again, the fracture was not immediately repaired, and the ankle became infected.  *Id.* at 12:22–13:3.  After two weeks, a surgeon fused the affected bones with screws and a metal rod.  *Id.* at 13:3–6.

The prison medical staff did not follow the hospital's instructions for Mr. Cobb's postoperative care.  *Id.* at 13:8–14.  After a few days, Mr. Cobb's leg became seriously infected, and his foot began "leaking" blood.  *Id.* at 14:6–11.  The medical staff placed Mr. Cobb in isolation and treated him with antibiotics for approximately 15 days.  *Id.* at 14:12–24.

After Mr. Cobb was released from isolation, Dr. Talbot forced him to try to walk on the injured foot.  *Id.* at 14:25–15:12.  The hardware "snapped," and blood began "pouring out the side" of Mr. Cobb's foot.  *Id.* at 15:13–16.  "From that day forward," Mr. Cobb "bled every day" until the foot was amputated years later.  *Id.* at 15:13–14.

### A.   Wexford Takes Over Mr. Cobb's Care

Wexford took over patient care at PCF on April 1, 2017.  By that time, Mr. Cobb had developed an injury in his left knee, for which he had arthroscopic surgery in January 2017. (Filing

No. 101-10 at 20.)  He also was receiving treatment for his foot injury at Ortho Indy.  His foot remained wrapped in a bandage.  Between bandage changes, blood would leak through the dressing and cover the rest of Mr. Cobb's foot.  (*See, e.g.*, Filing No. 101-9 at 56:7–8, 74:1–2, 108:1–9.)

On April 3 and 7, 2017, Mr. Cobb visited Ortho Indy and had his bandages changed. (Filing No. 113-2 at 4.)  Mr. Cobb did not return to Ortho Indy until April 20, 2017.  *Id.*  During the intervening two weeks, the PCF medical staff did not change Mr. Cobb's bandages, clean the blood off his foot, or provide him with materials to do either himself.  *Id.*

At Ortho Indy on April 20, 2017, Mr. Cobb received an injection for pain in his left knee, and his foot bandage was changed.  (Filing No. 101-10 at 20; Filing No. 113-2 at 4.)  Nurse Davis and Dr. Talbot examined Mr. Cobb on April 22, 2017, after he complained of serious knee pain following the injection.  (Filing No. 101-10 at 17–23.)  Dr. Talbot ordered x-rays but provided no treatment for Mr. Cobb's symptoms.  *Id.*

**B.**    **April 27, 2017 Ortho Indy Visit and Subsequent Treatment**

Mr. Cobb returned to Ortho Indy on April 27, 2017, where his dressing was changed, and Dr. Weber examined his foot.  (Filing No. 101-10 at 24.)  Dr. Weber remarked that Mr. Cobb's wound looked "significantly better" than it did the week before.  *Id.*  Dr. Weber called for Mr. Cobb to return for dressing changes each of the following two weeks and for another examination the third week.  *Id.*

Dr. Weber's orders were not followed.  Mr. Cobb changed his own bandages at PCF on May 3, 11, and 17, 2017, and Nurse Davis changed them on May 21, 2017.  (Filing No. 101-10 at 25; Filing No. 113-2 at 5.)  Mr. Cobb had his bandages changed at Ortho Indy on May 24, 2017 by Nurse Davis on May 30, 2017, and then again at Ortho Indy on June 6, 15, and 21, 2017.  (Filing

No. 101-10 at 26; Filing No. 113-2 at 5–6.)  Mr. Cobb was able to have the blood cleaned off his

foot—either on his own or by Nurse Davis—on June 14 and 15, 2017.  (Filing No. 101-10 at 28–

30.)

**C.**      **June 28, 2017 Ortho Indy Visit and the Unna Boot**

Dr. Weber examined Mr. Cobb at Ortho Indy on June 28, 2017—two months after his last

examination instead of three weeks as Dr. Weber directed.  (Filing No. 101-10 at 33.)  Dr. Weber

noted that Mr. Cobb had "lost ground" because his dressing had been removed and because he had

been placed on blood thinning medication.  *Id.*  Dr. Weber ordered that all blood thinners be

discontinued.  *Id.*  He also placed Mr. Cobb's foot in an unna boot, which the Court understands to

be a pre-packaged bandage soaked in zinc oxide and covered with a compression wrap, specifically

designed for treatment of foot ulcers.  *Id.*; *see, e.g.*, Univ. of Wis. Hosp. & Clinics Auth., *Care of*

*Your        Unna        Boot        Dressing*        (Mar.        2013),        avail.        at

https://www.uwhealth.org/healthfacts/pvs/4410.pdf (last visited June 11, 2020).

Dr. Weber ordered that Mr. Cobb return to Ortho Indy in one week to have the unna boot

changed and in two weeks for examination by Dr. Maar.  (Filing No. 101-10 at 33.)  Mr. Cobb

returned to Ortho Indy for a bandage change on July 5, 2017 and for a visit with Dr. Weber on July

14, 2017.  (Filing No. 113-2 at 7; Filing No. 101-10 at 35.)

Mr. Cobb states that the prison medical staff did not permit him to wear the unna boot

between trips to Ortho Indy.  (Filing No. 101-9 at 99–101:10.)  In fact, he states that Dr. Talbot

confiscated the unna boot and gave it to another inmate.  *Id.*  Nurse Davis cleaned blood off Mr.

Cobb's toes on July 6, 2017, and her treatment notes do not refer to the unna boot.  (Filing No.

101-10 at 34.)

**D.**    **July 14, 2017 Ortho Indy Appointment and 19-Day Treatment Gap**

At the July 14, 2017 visit, Dr. Weber observed that Mr. Cobb's wound "continue[d] to heal." (Filing No. 101-10 at 35.) He stated that Mr. Cobb "kept the dressing on " since the July 5, 2017 appointment and remarked that "[t]his is by far the best it has ever looked." *Id.* Dr. Weber directed that Mr. Cobb have a new unna boot applied that day, that he return to Ortho Indy for unna boot changes the following two weeks, and that he meet again with Dr. Weber in three weeks. *Id.*

Despite his instructions, Dr. Weber would not see Mr. Cobb for five months. Mr. Cobb did not return to Ortho Indy at all until August 2, 2017—and then only for a bandage change. (Filing No. 113-2 at 7–8.) There is no record that Mr. Cobb's bandages were changed at the prison during that 19-day period.

**E**    **Nurse Davis' "Snitch" Allegation**

On August 8, 2017, Nurse Davis told PCF inmates and correctional officers that Mr. Cobb was a "snitch," or confidential informant. (Filing No. 113-1 at ¶ 13.) This exposed Mr. Cobb to a serious risk of violence from other inmates, and his leg injuries made it difficult to defend himself. *Id.* Mr. Cobb alleges that Nurse Davis spread this rumor because he "was persistent with [his] grievances and complaints regarding [his] medical care." *Id.* Nurse Davis denies ever knowing whether Mr. Cobb cooperated as a confidential informant or telling others that he was a snitch. (Filing No. 101-2 at ¶ 17.)

**F.**    **August and September 2017**

On August 18, 2017, Mr. Cobb visited a wound clinic in Anderson. (Filing No. 113-2 at 8.) There is no record that Mr. Cobb's bandages had been changed during the 16 days since his

August 2, 2017 Ortho Indy appointment.  *Id.*  It is unclear what treatment was provided at the August 18, 2017 wound clinic appointment.

Later on August 18, 2017, Mr. Cobb visited the urgent care facility at the prison.  (Filing No. 101-10 at 36–37.)  Nurse Davis observed that the dressing on Mr. Cobb's foot was bloody, loose, and unsecured.  *Id.*  She cleaned the foot and applied a new dressing.  *Id.*

The only records of Mr. Cobb's medical care for the remainder of 2017 are Mr. Cobb's own calendars.  In the week following his August 18, 2017 wound care visit, his foot became raw and swollen.  (Filing No. 113-2 at 8.)  On August 21, 2017, Nurse Davis lost medications Mr. Cobb was given at the wound clinic.  *Id.*  His dressing was not changed until August 30, 2017. *Id.* Between August 18 and 30, 2017, Mr. Cobb was not allowed to change his own bandage, and Nurse Davis refused to change his bandage at least twice.  *Id.*

After August 30, 2017, Mr. Cobb's bandage was not changed until September 12, 2017, when Nurse Bagienski provided him the necessary supplies.  *Id.* at 9.  His bandages were changed again on September 16, 22 (by an unspecified outside doctor), and 29, 2017 (by Nurse LeeAnn Ivers).  *Id.*  Mr. Cobb received supplies to clean his foot on September 19, 2017.  *Id.*

### G.  <u>Confinement to Suicide Observation Cell</u>

Between Mr. Cobb's September 29, 2017 bandage change and October 3. 2017, Nurses McAbee, Shelby, and Bagienski falsely reported to Dr. Perry, a PCF psychiatrist, that Mr. Cobb's wounds were not healing because was mutilating his own foot.  (Filing No. 113-1 at ¶ 12(h).)  Mr. Cobb alleges that the nurses did this because he complained to them about not receiving supplies to care for his foot.  (Filing No. 101-9 at 43:21–44:2.)  In response to these reports, Dr. Perry directed on October 3, 2017 that Mr. Cobb be placed in a suicide observation cell.  *Id.* at 44:9–45:12; Filing No. 113-1 at ¶ 12(h).  Dr. Perry told Mr. Cobb he was being placed in the observation

cell because of the nurses' reports.  (Filing No. 101-9 at 44:9–22.)  In the observation cell, Mr. Cobb had only a "turtle suit" poncho for clothing and was completely naked part of the time.  *Id.* at 44:23–45:1; Filing No. 113-1 at ¶ 12(h).  Mr. Cobb remained in the observation cell from October 3, 2017 until he was released for an outside medical appointment on October 6, 2017.  (Filing No. 113-1 at ¶ 12(h); Filing No. 113-2 at 10.)

**H.    October and November 2017 and Six-Week Treatment Gap**

Mr. Cobb's bandages were changed at his outside medical appointment on October 6, 2017.  (Filing No. 113-2 at 10. ) His bandages were changed again on October 13 and 20, 2017. *Id.* Because no medical records document those changes, the Court infers that Mr. Cobb changed his own bandages at the prison on October 13 and 20, 2017.

Mr. Cobb's bandages were not changed again for six weeks.  *Id.* at 10–11.  During this time, Mr. Cobb's bandages began to cut into his foot, and he experienced pain and burning sensations.  *Id.*  Mr. Cobb was not taken to an outside medical appointment scheduled for October 27, 2017.  *Id.* at 10.  During this time, Mr. Cobb had intermittent access to tape and plastic sleeves to cover his foot while showering.  *Id.* at 11.

On November 10, 2017, Mr. Cobb asked Nurse Bagienski either to change his bandages or to provide him with bandages that he could apply on his own.  (Filing No. 101-9 at 68:9–12.)  She refused, stating that no bandages or tape were available.  *Id.*  However, Mr. Cobb learned from the prison pharmacist that plenty of bandages and tape were in stock.  *Id.* at 68:12–19.

**I.    December 2017**

Mr. Cobb's bandages were changed again on December 1, 2017.  (Filing No. 113-2 at 12.)  By December 5, 2017, blood was leaking out of the bandages and onto the floor.  (Filing No. 101-9 at 73:24–74:3.)  However, Nurse Shelby refused to change Mr. Cobb's bandages or to provide

tape or protective sleeves. *Id.* at 74:5; Filing No. 113-2 at 12. As a result, Mr. Cobb's bandages got wet. (Filing No. 113-2 at 12.) He asked a nurse for supplies on December 10, 2017 and was denied. *Id.*

On December 12, 2017, Mr. Cobb met with Dr. Weber. *Id.* Dr. Weber told Mr. Cobb that he "wasn't happy" about the long periods between bandage changes . *Id.* Mr. Cobb's bandages were changed at Ortho Indy that day. *Id.*

Following the December 12, 2017 Ortho Indy appointment, Mr. Cobb's bandages were not changed again until December 29, 2017. *Id.* By December 20, 2017, Mr. Cobb's foot smelled "like rotted flesh." (Filing No. 101-9 at 74:5–10.) Nurse Shelby again refused to change Mr. Cobb's bandages or provide materials for him to do so. *Id.* at 74:5–12. Mr. Cobb's bandages again began to cut into his foot. (Filing No. 113-2 at 12.)

**J.      January 2018 and Transfer to MCF**

On January 5, 2018, Mr. Cobb met with Dr. Talbot for a chronic care appointment. (Filing No. 101) The day before, Dr. Talbot communicated with Dr. Snyder, who was then Mr. Cobb's wound care specialist, and Dr. Weinberger, a vascular surgeon. *Id.* Dr. Talbot's notes from January 5, 2018 state that Mr. Cobb's "current orders for once weekly wound care with unaboot [*sic*] protocol per wound care center is to continue once weekly." *Id.* Dr. Talbot's notes also state that instructions for Mr. Cobb's wound care were "available to all nursing staff." *Id.*

Mr. Cobb's bandages were changed at the January 5, 2018 chronic care visit and again by Nurse Davis on January 8, 2018. *Id.* at 38, 41. On January 17, 2018, the Indiana Department of Correction transferred Mr. Cobb to Miami Correctional Facility. (Filing No. 101-10 at 43; Filing No. 113-4.)

## IV.  ANALYSIS

Based on the evidence discussed above, material factual disputes remain as to Mr. Cobb's Eighth Amendment claims against Wexford, Nurse Bagienski, and Nurse Shelby. However, summary judgment is appropriate for Mr. Cobb's observation cell claims and his retaliation claim against Nurse Davis.

### A.    Eighth Amendment Claim Against Wexford

Wexford seeks summary judgment on two grounds: (1) Mr. Cobb has not suffered a constitutional injury; and (2) even if he did, Mr. Cobb has not presented evidence demonstrating that a Wexford policy or practice caused that injury. (*See* Filing No. 114 at 5–6.) Because the evidence leaves material factual disputes on both issues, Mr. Cobb's Eighth Amendment claim against Wexford will proceed.

#### 1.    Eighth Amendment Injury

Wexford first argues that Mr. Cobb was "required to present evidence that he suffered a constitutional injury, and no such evidence has been presented." (Filing No. 114 at 5.)  In other words, Wexford argues that the medical care Mr. Cobb received from April 2017 until his transfer in January 2018 consistently met the Eighth Amendment's standards.

"To determine if the Eighth Amendment has been violated in the prison medical context," the Court must "perform a two-step analysis, first examining whether" Mr. Cobb "suffered from an objectively serious medical condition, and then determining whether" his medical care providers were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  None of the Defendants dispute that Mr. Cobb's chronic, bleeding wound constituted a serious medical condition. Instead, Wexford argues that the care its employees provided never amounted to deliberate indifference.

"[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

Yet, an Eighth Amendment claim does not fail for the mere fact that the plaintiff received "*some* treatment." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Rather, courts must consider "the possibility that the treatment [the plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). For example, even where treatment is provided, a fact finder may infer deliberate indifference from:

- a doctor's decision to ignore instructions from a specialist. *Zaya*, 836 F.3d at 806; *Petties*, 836 F.3d at 729.

- a doctor's persistence in a course of treatment known to be ineffective. *Petties*, 836 F.3d at 729–30.

- "an inexplicable delay in treatment which serves no penological interest." *Id.* at 730.

From April 2017 through January 2018, Mr. Cobb had a foot wound that bled constantly and required consistent medical care. The wound did not heal during or after that time. Mr. Cobb's foot was eventually amputated. The evidence discussed in this Order would support a jury in

concluding that the care Mr. Cobb received from April 2017 through January 2018 fell below the Eighth Amendment's standards and prevented his foot from healing.

Over the ten months in question, specialists' instructions were repeatedly ignored. On April 27, 2017, Dr. Weber instructed that Mr. Cobb return to Ortho Indy for bandage changes each of the following two weeks and for an examination the third week. (Filing No. 101-10 at 24.) Mr. Cobb did not return for a bandage change until nearly a month later, and he was not examined for two months. (Filing No. 113-2 at 5; Filing No. 101-10 at 33.) Dr. Weber issued the same instructions on July 14, 2017. (Filing No. 101-10 at 35.) Mr. Cobb did not return for a bandage change for almost three weeks, and he was not examined by Dr. Weber again for five months. (Filing No. 113-2 at 8, 12.) Meanwhile, Dr. Talbot's notes from January 5, 2018, document that the wound care specialist had directed that Mr. Cobb's bandages be changed weekly. (Filing No. 101-10 at 38.) However, in the preceding month alone, Mr. Cobb was left to wear the same bandages for periods of 11 and 17 days. (Filing No. 113-2 at 12.)

No evidence before the Court suggests that the Wexford staff diverged from the specialists' instructions based on medical judgment. *Zaya*, 836 F.3d at 805. No medical record acknowledges a specialist's instructions and explains why different treatment would be preferable. Indeed, for long periods, Mr. Cobb received no treatment at all. At least eight times in ten months, Mr. Cobb wore the same bandages for 11 days or longer.[1] During these periods, Mr. Cobb did not receive

---

[1] These eight instances occurred from:

- Apr. 7–20 (13 days). Filing No. 101-10 at 20; Filing No. 113-2 at 4.

- July 14–Aug. 2 (19 days). Filing No. 101-10 at 3; Filing No. 113-2 at 7–8.

- Aug. 2–18 (16 days). Filing No. 113-2 at 8.

- Aug. 18–30 (12 days). *Id.*

treatment from the Wexford staff *instead of* the treatment the specialists ordered.  Rather, he was denied any form of treatment *and* the materials necessary to treat the wound himself.

The Defendants nevertheless maintain that Mr. Cobb's treatment satisfied the Eighth Amendment because he "was referred to off-site specialists at least sixty (60) times."  (Filing No. 114 at 6.)  This argument is alarming in at least three respects.

First, the Defendants do not support their argument with *any* citation to evidence, leaving the Court to search the record for 60 documents or notations referring to off-site doctor visits. Defense counsel should not expect the Court to embark on such a search without guidance.  *See* Fed. R. Civ. Pro. 56(c)(3) ("The Court need only consider the cited materials . . . ."); *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 572–73 (7th Cir. 2017) (holding that courts need not "scour the record in search of evidence" when adjudicating summary judgment motions); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

Second, the Court finds only 16 off-site medical visits documented in the record.[2]  As such, the Defendants seek summary judgment based on a factual assertion that is either demonstrably

---

- Aug. 30– Sept. 12 (13 days). *Id.* at 8–9.

- Oct. 20–Dec. 1 (42 days). *Id.* at 10–12.

- Dec. 1–12 (11 days). *Id.* at 12.

- Dec. 12–29 (17 days) *Id.* at 12.

[2] These outside visits occurred on April 3, 7, 20, and 27; May 24; June 6, 15, 21, and 28; July 5 and 14; August 2 and 18; September 22; October 6; and December 12. The Court's statement of facts, Part III, *supra*, includes citations to the records documenting each outside visit.

false or based on evidence not in the record.  Neither is acceptable.  *See* Fed. R. Civ. P. 11(b)(3); Fed. R. Civ. P. 56(c)(3).

Third, Wexford's argument flies in the face of the controlling law.  Sending a patient for outside treatment does not entitle a prison doctor to Eighth Amendment immunity.  If the doctor then disregards the specialist's instructions without exercising medical judgment, he is deliberately indifferent to his patient's medical needs.  *Zaya*, 836 F.3d at 806.  That is the picture the evidence paints in this case, and Wexford's "off-site specialists" defense therefore misses the mark.

## 2.     <u>Wexford Policy or Practice</u>

Although a private entity, Wexford acts under the color of state law and therefore may be liable for violating Mr. Cobb's Eighth Amendment rights only under the theory announced in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019).  "Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused" the constitutional violation discussed above.  *Id.*

"It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach."  *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).  "[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."  *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990).  In *Glisson*, the Seventh Circuit held that providing medical care to prisoners with chronic, complex illnesses is one such situation.  *See Glisson*, 849 F.3d at 381 (citing *Sims*, 902 F.2d at 543).  "One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care."  *Id.* at 382.  A prison medical provider can be liable under the Eighth Amendment for making "a deliberate policy choice pursuant to which no one was responsible for coordinating " the overall care of such patients.  *Id.* at 375–76.  A plaintiff may

prove such a policy choice "in a number of ways, including but not limited to repeated actions." *Id.* at 381.

A jury could reasonably find from the repeated actions—or inactions—of Wexford's employees that Mr. Cobb was harmed by Wexford's conscious decision not to implement policies or procedures to ensure that patients with complex, chronic conditions received coordinated care.

When Wexford took over in April 2017, the wound on Mr. Cobb's foot had been open and bleeding for nearly two years. The medical records for this ten-month period alone refer to four outside doctors from at least two separate facilities. Inside the prison, Dr. Talbot and at least four nurses were responsible for Mr. Cobb's care.

The treatment prescribed by Mr. Cobb's specialists required that he return for weekly dressing changes and less frequent examinations. More often than not, Mr. Cobb missed those follow-up appointments, and his medical records do not explain why. Additionally, on at least one occasion, Mr. Cobb "lost ground" on his wound because—contrary to Dr. Weber's treatment plan—his dressings were removed, and he was placed on a blood thinner. (Filing No. 101-10 at 33.)

For ten months, the Wexford staff at PCF consistently failed to ensure that Mr. Cobb received the treatment that his specialists prescribed—whether at the specialists' offices or at the prison. A jury could reasonably find that Wexford knew that some of its patients were likely to have conditions requiring that care be coordinated among several medical care providers on and outside its own staff; that the failure to implement policies or protocols to ensure such coordination would place such patients at imminent risk of serious harm; and that its failure to implement such policies or protocols was based on a conscious choice. *See Glisson*, 849 F.3d at 382.

The Defendants, citing *Walker*, argue that Mr. Cobb must introduce evidence beyond his own experience to support a *Monell* claim against Wexford. (*See* Filing No. 114 at 7.) *Walker* notes that "inmates *generally* cite other examples where a constitutional violation similarly occurred" to prove the existence or absence of a policy. 940 F.3d at 966 (emphasis added). But *Glisson* discusses no other patients' treatment and shows that evidence of other inmates' deprivations is not necessary to prove a *Monell* claim. Additionally, *Walker* was decided in part on evidence that delays in scheduling the plaintiff for outside appointments were attributable to the outside medical providers and not to the defendant's policies or practices. *Id.* at 967. By contrast, there is no evidence that any individual or outside entity was responsible for the consistent gaps in Mr. Cobb's medical care.

In sum, a jury could reasonably find that Wexford opted not to implement policies or procedures to ensure coordination of treatment for patients with chronic, complex cases. A jury could further find that this decision caused Mr. Cobb to receive medical care falling below the Eighth Amendment's standards. Accordingly, Mr. Cobb's Eighth Amendment claim against Wexford will continue.

**B.** **Eighth Amendment Claims Against Nurses McAbee, Shelby, and Bagienski**

Mr. Cobb attempts to maintain Eighth Amendment claims against individual Defendants based on three sets of facts. First, Nurse Bagienski was deliberately indifferent to Mr. Cobb's serious medical needs when she refused to change his bandages or provide necessary medical supplies on November 10, 2017. Second, Nurse Shelby was deliberately indifferent to Mr. Cobb's serious medical needs when she refused to change his bandages or provide supplies on December 5 and 20, 2017. Finally, Nurses McAbee, Shelby, and Bagienski falsely accused Mr. Cobb of self-mutilation so he would be placed in a suicide observation cell. Mr. Cobb's individual claims

against Nurses Bagienski and Shelby will proceed, but summary judgment is appropriate for the observation cell claim.

### 1.   <u>**Bandage Change and Supply Claim Against Nurse Bagienski**</u>

Mr. Cobb alleges that Nurse Bagienski was deliberately indifferent to his serious medical needs when she refused to change his bandages or provide supplies on November 10, 2017. Mr. Cobb changed his own bandages on October 20, 2017.  ([Filing No. 113-2 at 10](#).)  Thus, on November 10, 2017, his bandages were three weeks old.  He asked Nurse Bagienski either to change his bandages or to provide him with bandages that he could apply on his own.  ([Filing No. 101-9 at 68](#):9–12.)  She refused, stating that no bandages or tape were available.  *Id.*  However, Mr. Cobb later learned from the prison pharmacist that plenty of bandages and tape were in stock. (*Id.* at 68:12–19.)  Mr. Cobb's bandages were not changed for *another* three weeks after this encounter.  ([Filing No. 113-2 at 11](#)–12.)

The Defendants have not responded to Mr. Cobb's allegations against Nurse Bagienski or the evidence supporting them.  Mr. Cobb presented to Nurse Bagienski on November 10, 2017 with bandages that required weekly changes but were three weeks old.  A jury could reasonably find that Nurse Bagienski knew that Mr. Cobb faced an imminent risk of serious harm if his bandages were not changed and that she nevertheless refused to change them or equip him to do so.  Accordingly, summary judgment is not appropriate for Nurse Bagienski.

### 2.   <u>**Bandage Change and Supply Claim Against Nurse Shelby**</u>

Mr. Cobb also asserts that Nurse Shelby was deliberately indifferent to his serious medical needs when she refused to change his bandages or provide supplies on December 5 and 20, 2017. On December 5, , 2017, Nurse Shelby refused to change Mr. Cobb's bandages or provide protective sleeves, even though blood was leaking out of his bandages.  ([Filing No. 101-9 at 73](#):24–74:5;

17

Filing No. 113-2 at 12.)  As a result, Mr. Cobb's bandages got wet.  (Filing No. 113-2 at 12.)  On December 20, 2017, Nurse Shelby again refused to change Mr. Cobb's bandages or provide necessary materials, even though his bandages were eight days old and smelled "like rotted flesh." (Filing No. 101-9 at 74:5–12.)  Afterward, Mr. Cobb's bandages began to cut into his foot.  (Filing No. 113-2 at 12.)

The Defendants seek summary judgment on grounds that "there is no evidence directly indicating that Nurse Shelby was aware of any serious medical need for the Plaintiff to receive new bandages or a bandage change." (Filing No. 114 at 4.)  However, Mr. Cobb has presented evidence showing that blood was leaking out of his bandages on December 5, 2017 and that his foot smelled like rotted flesh on December 20, 2017.   Based on this evidence, a jury could reasonably conclude that Nurse Shelby knew that Mr. Cobb was suffering from a serious medical condition and that any delay in providing fresh bandages would expose him to an immediate risk of serious harm.  Additionally, Nurse Shelby states that her practice as a nurse was to follow orders from off-site physicians, and she acknowledges that a specialist ordered that Mr. Cobb's bandages be changed weekly.  (Filing No. 106 at ¶¶ 7, 11.)  Accordingly, a jury could reasonably conclude that Nurse Shelby refused to provide treatment ordered by a specialist. *Zaya*, 836 F.3d at 806.  For these reasons, summary judgment is not appropriate for Nurse Shelby.

### 3.   Observation Cell Claims Against Nurses McAbee, Bagienski, and Shelby

The Defendants seek summary judgment on Mr. Cobb's claim that Nurses McAbee, Bagienski, and Shelby falsely reported that he was mutilating his own foot so he would be confined to a suicide observation cell.  The Defendants argue that these three nurses had no authority to move Mr. Cobb to the observation cell, that Dr. Perry properly determined that the move was

necessary, and that, as a result, their statements could not have constituted deliberate indifference toward a serious medical need.

The Eighth Amendment proscribes the "'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The unnecessary and wanton infliction of pain may take various forms beyond deliberate indifference to medical needs, including the imposition of punishment "so totally without penological justification that it results in the gratuitous infliction of suffering," *Gregg*, 428 U.S. at 183, and harassment "intended to humiliate and inflict psychological pain," *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003).

The Defendants assert that the three nurses lacked any authority to direct that Mr. Cobb receive specific treatment, including confinement to an observation cell.  )*See* Filing No. 101-3 at ¶ 13; Filing No. 101-5 at ¶ 11; Filing No. 106 at ¶ 11; 114 at 3.)  Mr. Cobb has not responded with any evidence to the contrary.  Additionally, he has not presented any evidence supporting the inference that the three nurses would have known that if they stated Mr. Cobb was injuring himself, he would be placed in an observation cell.

"'As the "put up or shut up" moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant*, 870 F.3d at 568 (quoting *Harney v. Speedway SuperAmerica*, 526 F.3d 1099, 1104 (7th Cir. 2008)). To avoid summary judgment on this claim, Mr. Cobb needed to present evidence from which a jury could conclude that the defendant nurses consciously disregarded his safety or intentionally exposed him to gratuitous physical or mental suffering.  Assuming that the nurses falsely reported that Mr. Cobb was injuring himself, Mr. Cobb would still need to present evidence that the nurses

knew those reports would result in his confinement to an observation cell.  He has not done so, and summary judgment is therefore proper.

## C.     First Amendment Retaliation Claim Against Nurse Davis

Finally, Mr. Cobb opposes summary judgment on his claim that Nurse Davis told others he was a snitch in retaliation for exercising his First Amendment rights.  A plaintiff asserting a First Amendment retaliation claim must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action."  *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

The third element disposes of Mr. Cobb's claim.  At summary judgment, a prisoner alleging retaliation must present evidence that the defendant's actions were motivated by retaliatory animus. *See Stewart v. Wall*, 688 F. App'x 390, 394 (7th Cir. 2017) ("Stewart needed to present evidence that the nurse wrote this message *because* of his grievances or this lawsuit. And he has proffered no evidence that the nurse even knew about the grievances, let alone that she wrote it in reaction to the grievances or this suit.") (internal citations omitted).

Nurse Davis attests that she never told anyone Mr. Cobb was a snitch.  (Filing No. 101-2 at ¶ 17.)  In doing so, she effectively attests that she never told anyone Mr. Cobb was a snitch because she was fueled by retaliation.  Mr. Cobb rebuts this evidence with his own affidavit testimony that Nurse Davis made such statements and others observed them.  (Filing No. 113-1 at ¶ 13.)  However, he has not presented any evidence of Nurse Davis' motivation.

Mr. Cobb argues that his affidavit testimony raises a material factual dispute.  (Filing No. 113 at 12.)  He refers to his statement that "Nurse Davis told people I was a snitch because I was persistent with my grievances and complaints regarding my medical care."  (Filing No. 113-1 at ¶

13(d).)  However, Mr. Cobb has not explained—much less supported with evidence—how he gained personal knowledge of Nurse Davis' motivations.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Accordingly, this testimony would not be admissible, and the Court may not consider it at summary judgment.

Assuming Nurse Davis told inmates that Mr. Cobb was a snitch, no evidence would allow a jury to conclude that she did so because of retaliatory motives.  Indeed, the only evidence on the issue is her denial.  Nurse Davis is entitled to summary judgment on Mr. Cobb's First Amendment retaliation claim.

## V.  <u>CONCLUSION</u>

The Defendants' Motion for Summary Judgment, (Filing No. 99), is **GRANTED** as to Mr. Cobb's First Amendment retaliation claim and his Eighth Amendment observation cell claim.  All claims against Nurses Davis and McAbee are **DISMISSED**.

The Motion is also **GRANTED** as to Defendants LeeAnn Ivers, Lisa Bergeson, Roger Perry, and Genifer Bradly (correctly spelled Jennifer Bradley).

No partial final judgment shall enter at this time.

The Motion is **DENIED** as to Mr. Cobb's Eighth Amendment claims against Wexford, Nurse Bagienski, and Nurse Shelby.  The Court will issue a separate order with instructions for the proceedings that will resolve these claims.

The **Clerk is directed** to update the docket (and the spelling of the parties' names on the docket) consistent with the following:

- the plaintiff is Malcolm D. Cobb, Jr.;

- the remaining Defendants are Melissa Bagienski, Shawna Shelby, and Wexford of Indiana, LLC; and

- all other Defendants are **terminated**.

**SO ORDERED.**

Date:  7/2/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Annemarie Alonso
SAEED & LITTLE LLP
annie@sllawfirm.com

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jarod Zimmerman
KATZ  KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com